# CHARLESTON.

## State *v.* Edwards.

Sumbitted January 27, 1902.     Decided March 22, 1902.

1. Larceny—*Fraud—Trick—Conversion.*

    Where a person, by means of some fraud or trick, procures the delivery of money or goods to him by the owner, with the intent to steal the same, it amounts to a taking of the property within the definition of larceny, unless the delivery of the possession is made for the purpose of passing the title to the property as well as its possession; and, if possession be acquired by such means and with such intent and the goods or money are afterwards converted by the taker to his own use, the offense is larceny. · (p. 221).

2. False Pretense—*Intent—Larceny.*

    Where both possession and title are obtained by false pretenses with intent to defraud, the offense is obtaining money by false pretenses, in which case the statute declares that the offender shall be deemed guilty of larceny. (p. 224).

3. Fraudulent Tricking—*Felonious Larceny.*

    When possession is obtained by means of fraud, trick or device, so as to make the taking felonious, and the taker converts the property to his own use, the offense is common law larceny and a conviction may be had upon a common law indictment for larceny. (p. 225).

4. Larceny—*Indictment—Allegations.*

    In such case, the indictment need not specify the means by which the larceny was effected. (p. 229).

5. · Larceny—*Intent—Question for the Jury.*

    Whether the possession was so obtained with intent to steal is a question for the jury. (p. 230).

6. Larceny—*Evidence—Search of Person.*

    The instruments, devices or tokens used in the commission of a crime are competent and legitimate evidence in the trial of the accused, and the taking of them from his person by an officer who has arrested him upon a charge of his having committed the crime, is not an illegal seizure, nor is the search of

his person for such instruments an unreasonable search within the meaning of the constitutional provision against unreasonable search.   (p. 230).

Error to Circuit Court, Harrison County.

D. J. Edwards was convicted of grand larceny, and brings error.

*Affirmed.*

M. G. SPERRY and J. R. SWIGGER, for plaintiff in error.

J. E. LAW, Prosecuting Attorney, and R. H. FREER, Attorney General, for the State.

POFFENBARGER, JUDGE:

Although involving an old and well settled principle of criminal law, this case is the first of the kind to come to this Court and seems to be rather novel because the courts are not often called upon to pass upon cases involving the question presented here.   It is a conviction of the crime of grand larceny where the prosecutor has been deprived of his money by a trick and conspiracy.   E. L. Dennison, a farmer residing in Harrison County at a point about twelve miles from Clarksburg, was the victim.   On a certain Thursday while away from home he was followed up by the defendant, D. J. Edwards, who represented himself to be one of a wealthy firm of bankers and coal operators of Fairmont, named Watson, and said he wanted to buy the prosecutor's land, a tract of about four hundred acres, for the purpose of developing it as oil land, that being a section of the State in which there was considerable activity in oil production at that time.   He made an appointment with Dennison, to see him at his (Dennison's) home on the following Monday, promising to bring with him some other parties.   On the day agreed upon he came but there was nobody with him.   He explained this by saying that the party whom he had expected to bring was a woman and that she was sick.   He said he would bring her over in a few days, that whatever he might do would be all right, but that he did not want to trade until she came.   He then invited Dennison to get in his buggy and drive down the road with him and show him the land.   After they had gone some distance they met a large man, who, as they were driving past, inquired the distance to Clarksburg, and began a conver-

sation. Edwards immediately stopped the buggy, and the large man represented that he lived in Alabama and had a sister living, as he supposed, at some place near Clarksburg for whom he was hunting, claiming that she had been disinherited by her father, that her father had since died and that he had come into possession of a large amount of money and was seeking her with the view of dividing with her. He represented that a man whom he had met in Harrison County had won five hundred dollars from him in a game which they had played and then coming up to the buggy produced the cards and began to show Dennison and Edwards the three card Monte game by which he had lost the five hundred dollars. After manipulating the cards a while he proposed to bet on them. Dennison was reluctant but was encouraged by Edwards. The big man pulled a red handkerchief out of his pocket, apparently full of money, from which he took two five dollar bills, handing one to Edwards and the other to Dennison. After some shuffling of the cards and Edwards and Dennison had each turned a blank, the man from Alabama proposed to play with them for two thousand dollars and took out a roll which had the appearance of money and had marked on it, "two thousand dollars," and placed it in the hands of Dennison. Edwards took it out of his hands and placed it in the inside pocket of Dennison's vest. Then the man from Alabama said all he asked of them was that they get the money, to which Dennison replied that he had no money there and they suggested that he had money at Clarksburg in the bank and he replied that he did have some there. Then Edwards opened a satchel containing a little tin box and said to the man from Alabama that they would put the money into that box and lock it up and give him the key and they would go to Clarksburg to get their money. Dennison said he would have to go home first and they drove back to his house where they ate dinner and then drove to Clarksburg. They were to raise two thousand dollars between them and Edwards insisted that Dennison should borrow some money and make his share eight hundred dollars while he, Edwards, undertook to furnish the balance, representing that he could get all the money he wanted from the woman of whom he had spoken. Dennison declined to borrow any money but agreed to put in what he had in the bank, three hundred dollars, Edwards agreeing to raise the balance, seventeen hundred dollars.

Dennison went to the bank and got his money while Edwards pretended to go and get the seventeen hundred dollars. They then went back and met the stranger on the road. After they had met him, Edwards pulled out what appeared to be a bunch of money and said "Here is my money, Mr. Dennison, where is yours?" Then Dennison took out his three hundred dollars and Edwards took it and said, "Now here is my pile and here is Mr. Dennison's, are you satisfied?" After a pretense of quibbling over the matter, he unlocked the tin box and took out the bundle that had been left in it and then deposited it and Edward's bundle and Dennison's money in the box and the three went on in the buggy. After going about two miles Dennison suggested that they return to the unfortunate Alabamaian part of his money, to which Edwards at first objected but afterwards assented and the box was opened and one of the bunches handed to the stranger. Dennison's story is not very clear but the substance of it seems to be that there was a pretense that he and Edwards had won the two thousand dollars from the stranger, but he required them, as a condition precedent to final payment of it, that they produce an equal amount and that it was for that purpose that they had gone to Clarksburg. He says that on the way to Clarksburg and back Edwards had repeatedly told him to take care of the money and that he, Edwards, would take care of the man, meaning that, as the man was anxious to get out of the country where he was losing so much money, he would take him to the train. As they drove along the road it was suggested that Dennison take Edwards satchel and the money and go on home while Edwards took the other man to the train, and when they had driven to a certain point the buggy was stopped and Edwards ordered Dennison and the stranger to get out and told Dennison to take the satchel but he did not care to take it and then Edwards said, "I'll just give you the box," and then the big man walked around and engaged Dennison in conversation while Edwards got out the box and wrapped it up in a newspaper. He then handed it to Dennison to take home with him, promising, himself, to come back that night or the next morning at the latest, when they would divide. Then Edwards and the stranger got in the buggy and drove off. Soon afterwards, Dennison, suspecting that he had been defrauded, opened the box and found that it contained no money but, as he says, a few old papers. In fact it was a bundle or roll of worth-

less old State bank notes which bear some resemblance in appearance to our currency. Dennison then went in hot pursuit of the men and succeeded in having the defendant arrested before he got away but the other man escaped. On the person of the defendant was found one hundred and ten dollars in good money, consisting of five twenty dollar bills and two five dollar bills. In addition to this he had a supply of the worthless bank notes. The money that Dennison had gotten from the bank was all in twenty dollar bills and the cashier of the bank testified that the bills found in the defendant's possession looked very much like those which he had given the prosecutor at the bank.

The indictment contained three counts; two of them were in the usual form and the third contained allegations of false pretense and misrepresentation. On motion to quash the indictment and each count thereof, the court sustained the motion as to the last count and overruled it as to the others. On the trial the jury found the defendant guilty on the second count of the indictment and acquitted him as to the first count. A motion to set aside the verdict was overruled and the prisoner was sentenced to three years' confinement in the penitentiary. Several exceptions were taken and the case has been brought to this Court on a writ of error.

Unless there is some error by the admission of improper evidence or in reference to the instructions, the verdict cannot be disturbed. Where a person, by means of some fraud or trick, and with intent to steal, procures the delivery of money or goods to him by the owner, it amounts to a taking within the definition of larceny, unless the delivery of the possession is made for the purpose of passing the property or title in the goods as well as the possession. And, if possession be acquired by such means and with such intent and the goods or money are afterwards converted by the taker to his own use, the offense is larceny, and whether such intent existed at the time of the taking and practice of the fraud, is a question for the jury. But this distinction must be borne in mind: If the property is delivered with the intention on the part of its owner of parting with it altogether, passing both title and ●possession, the offence is not larceny but obtaining property by false pretenses; but if the owner is induced to deliver the possession only, the taker having a preconceived design to convert it to his own use when obtained, it

is implied that the taking is against the will of the owner and the offence is larceny. While the act of taking, in order to constitute larceny, must be a trespass against the owner's possession, actual violence is not necessary, for in these cases the fraud by which possession is acquired takes the place of force. 18 Am. & Eng. Ency. Law, (2d Ed.) 469, 478; 12 Am. & Eng. Ency. Law, (2d Ed.) 805.

These principles are well illustrated in numerous cases and the application of them runs back to some of the very old English cases. In *Semple's Case,* Leach C. L. 355, it was held that to hire a chaise for any length of time with an intention to convert it wrongfully to the use of the hirer is larceny and the non-delivery of it to the owner is evidence of such conversion. In *Pear's Case, Id.* 213, it is held that the obtaining of a horse under the pretense of hiring it for a day, is felony, if the jury find the hiring was *animo furandi.* In *Patch's Case, Id.* 231, it is held that to obtain property from another by the practice of ring dropping is felony if the jury find it was obtained under a preconceived design to steal it. In *Moore's Case, Id.* 291, it is held that to aid and assist a person, to the jury unknown, to obtain money by the practice of ring dropping, is felony, if the jury find that the person was confederating with the person unknown to obtain the money by means of the ring. In this case, after the prosecutor and the prisoner's confederate had agreed to divide the value of the ring between them, the prosecutor gave him twenty guineas and four doubloons on the faith of the ring, which he held as a pledge, with the understanding that the stranger should return them the next morning and take the ring and give the prosecutor one hundred guineas for his share of the ring. The Reporter says: "All the judges agreed, that in considering the nature of larceny, it was necessary to attend to the distinction between the parting with the possession and the parting with the property only; that in the first case it is felony, and in the last case it is not. Upon the circumstances of the present case two of the judges were of opinion, that the doubloons were to be considered as money, and that the whole was a loan on the security of the ring, which the prosecutor believed to be of much greater value than the money he advanced on it, and therefore that the possession as well as the property was parted with. But nine of the judges were clearly of opinion that it was felony; for they thought the twenty guineas and the

four doubloons were only deposited in the nature of a pledge till the half of the supposed value of the ring was paid to the prosecutor, and therefore he had parted with the property only, and not with the possession."

Loomis v. People, 67 N. Y. 322, 23 Am. Rep. 123, was a case very similar to this one. Olason, the prosecutor, was decoyed into a saloon by Lewis, a confederate of the prisoner, Loomis. Lewis pretended to have a check for five hundred dollars on the faith of which he got Olason to loan him ninety dollars in the following manner: Loomis and Lewis threw dice for five dollars, Loomis losing. Then Lewis agreed to divide that with Olason, but he declined to have anything to do with it. Then Loomis put up what was called one hundred dollars, and Lewis having only ten applied to Olason for ninety more saying, "I am sure to beat him again, and you can have your money back. If I do lose I have got the check for five hundred dollars and we will go to the bank and get the check cashed, and you can have the money." Olason let him have the money, the dice were thrown, and Loomis won. Olason wanted his money back but Lewis asked him to let him have one hundred dollars more which he refused. Then Lewis put up the pretended five hundred dollar check against the one hundred dollars put up by Loomis and Loomis won that, whereupon Lewis declared he was worth nothing and the two confederates went away with Olason's money. This was held to be sufficient to constitute larceny. Miller, Judge, delivering the opinion of the court, says: "There is to be sure a narrow margin between a case of larceny and one where the property has been obtained by false pretenses. The distinction is a very nice one, but still very important. The character of the crime depends upon the intention of the parties, and that intention determines the nature of the offense. In the former case, where by fraud, conspiracy or artifice, the possession is obtained with a felonious design and the title still remains in the owner, larceny is established. While in the latter, where title, as well as possession, is absolutely parted with, the crime is false pretenses." Miller v. Commonwealth, 78 Ky. 15, 39 Am. Rep. 194, is very similar to the Loomis case. There, the prosecutor, being intoxicated, was lured into a room where a game of faro was being operated by the conspirators. The game was called a "brace" game and was so conducted that the conspirators always won and it was impossible for others to

win. Here, the prosecutor gave the defendant's confederate ten dollars at three different times to bet on the game and each time it was lost. On this state of facts, Cofer, Judge, said: "When the money was given to Smith to bet, it ought not to be assumed that the prosecutor meant more than that it should be hazarded on the game, and to part with his property if he lost. But if, by concert between Smith and Miller, they knew, before the cards were dealt, that it would be lost, they are guilty precisely as if by concert between them Smith had obtained the money to bet, and immediately, without going through the mere form of betting, had divided it between them." *People* v. *Rae,* 66 Calif. 423, is another case which, although materially different from this one in its facts embodies the same principle, and it was there held that "When by means of fraud, conspiracy, or artifice, possession of property is obtained with felonious intent, and the title still remains in the owner, the crime is larceny; but if the title as well as the possession is parted with, the crime is that of obtaining property by false pretenses."

Applying these principles to the case under consideration it was clearly right to submit to the jury the determination of the question, whether the prisoner did all the acts which induced the prosecutor to part with the possession of his money, with a preconceived purpose and design to take his money and convert it to their own use. The evidence in the case shows that the three hundred dollars was not to be used in any game thereafter to be played but was simply to be produced and shown with the pretended seventeen hundred dollars of the prisoner's money, as a condition precedent to the relinquishment to them by the prisoner's confederate of the two thousand dollars which, it was pretended, they had already won from the stranger, and the prosecutor's money was delivered to the prisoner for a special and very limited purpose, namely, to put it with the seventeen hundred dollars in the box to make a total of two thousand dollars, which, with the money won from the confederate, made in all four thousand dollars, composed of what they had risked and won, and which the prosecutor and prisoner were to divide. Such being the facts, there was nothing more than a bailment of the prosecutor's money, and he had no intention of parting with anything but its mere possession, for a very special purpose, to be executed in his presence, and the money to be returned to him and to remain in his possession until the prisoner should return

for the purpose of making the division. In the execution of this purpose for which the money was put in the hands of the conspirators, they fraudulently and by means of a trick and device abstracted it from the box and carried it away. "Where money is placed by the owner in the hands of another person to be applied to a special purpose, such as the payment of the owner's debts, and such person appropriates the money so committed to him, it is larceny, though the relation of master and servant did not exist; but it is not larceny if the money was to have been kept for the owner or used for him by way of investment or otherwise." 18 Am. & Eng. Ency. Law, (2d Ed.) 476. If the jury had found from the evidence, or if it clearly appeared to the court from the evidence, that the prosecutor intended to part with the title as well as the possession of his money, there could be no conviction of the crime of larceny but there might be a conviction of the crime to obtain money by false pretenses. But it cannot be inferred from anything in the evidence in this case that the prosecutor intended to part with anything but the possession of his money for a very limited time and a very special purpose. It was represented to him that he had already won the money and that the delivery of the possession of his money for the mere purpose of showing that he had it, after which it was to be returned with all the other pretended money to him to be by him held until it should be divided. It was for the jury to say whether it was with a design and intention on the part of the prisoner and his associate to steal the prosecutor's money, that they approached him as they did and pretended to play a game in which they represented that he had won and thereby induced him to thus part with the possession of his money. On the trial the jury did so find, and the verdict cannot be disturbed on the ground that it is contrary to the law and the evidence.

The prisoner asked the court to instruct the jury that if they believed from the evidence that the prosecutor willingly and voluntarily parted with his property by placing it in the hands of the prisoner to be used for an illegal and illegitimate purpose and the prisoner afterwards converted the property to his own use, there could be no conviction of larceny. The court refused to give the instruction and it is argued that this was error. If the prosecutor had bet his three hundred dollars on the game and had lost it, he could have recovered it in a civil action under

section 2 of chapter 97 of the Code. There is no evidence that
he loaned or advanced the prisoner the money to be bet or
wagered in a game so as to bring it within the meaning of sec-
tion 1 of said chapter.    Assuming that there is evidence, that
this money was to be used in a game to be played after it was
delivered, it was to be used as the money of the prosecutor and
not as money loaned to the prisoner.    But there is no such evi-
dence.    The evidence only tends to show that the pretended
game had already been played and that it was in fact a mere
trick and device in the scheme to get the possession of the prose-
cutor's money.    Hence, the statute against gaming has no appli-
cation here.    And there is nothing in the case from which it
appears that the prosecutor's title to his money was forfeited so
as to relieve the prisoner from the charge of the larceny thereof,
even if such forfeiture, when it does exist, would have that ef-
fect.    So the instruction was properly refused.

Another objection is, that it was error to permit the State to
introduce testimony tending to show that the defendant ob-
tained the money by means of false representations, trickery
and fraud, for the reason that the indictment does not specify
the means by which the larceny was effected.    There is nothing
in this.    It has been held repeatedly in Virginia that a con-
viction of larceny for obtaining money under false pretenses may
be sustained upon a common law indictment for larceny.
*Dowdy* v. *Commonwealth,* 9 Grat. 727; *Leftwich* v. *Common-
wealth,* 20 Grat. 716; *Price* v. *Commonwealth,* 21 Grat. 846;
*Anable* v. *Commonwealth,* 24 Grat. 563; *Fay* v. *Commonwealth,*
28 Grat. 912.    2 Bishop's Crim. Proc., s. 185, says of this Vir-
ginia doctrine, that it would be contrary to principles generally
maintained.    But it is certainly sufficient where the case is one
of pure common law larceny, as this one is.

The attorney for plaintiff in error devotes a great deal of his
brief to his objection to the admission of the worthless State
bank notes as evidence in the case on the ground that these
papers having been taken from the person of the defendant by
the officer who arrested him, were illegally seized.    One com-
plete answer to this is that if it was an illegal seizure, that is
no objection to the use of the papers as evidence, they being
proper evidence in the case in other respects, for the court can
take no notice how they were obtained, whether lawfully or un-
lawfully; nor would it form a collateral issue to determine that

question, *Commonwealth* v. *Dana,* 2 Metc. (Mass.) 329, 337; *Legatt* v. *Tollervey,* 14 East 302; *Jordan* v. *Lewis,* 14 East 306. But the seizure was not illegal for the reason that these papers were instruments or tokens used by the defendant in the perpetration of the crime with which he is charged and with which he stood charged at the time they were taken from his person. There is such a thing as unreasonable search which the law will not permit, but where a man stands charged with crime and an instrument or device is found upon his person or in his possession which was a part of the means by which he accomplished the crime, those instruments, devices, or tokens are legitimate evidence for the State and may be taken from him and used for that purpose. If it were otherwise, the pistol with which a murderer shoots down his victim or the dagger with which he stabs him, inseparably connected with the *corpus delicti,* and, therefore, competent and legitimate evidence, could not be taken from the pocket of the murderer and used as evidence against him, for the reason that they belong to him and are found upon his person. It is well settled that a person in custody on a criminal charge may be subjected to a personal search and examination against his will in order to discover upon him evidence of his criminality. 55 Am. St. Rep., note, 228; citing *Rusher* v. *State,* 94 Ga. 363; *Ex parte Hurn,* 92 Ala. 102; *Closson* v. *Morrison,* 47 N. H. 482. In *Shields v. State,* 104 Ala. 35, a pistol found concealed upon the defendant's person by an officer, prior to his arrest, by making forcible search of his person, was held admissible against the defendant, although the search was unauthorized and unlawful. Take the case of a burglar who is charged with the crime. Is it possible that the officer arresting him upon a warrant for his arrest cannot take from his person the kit of tools with which he effected the burglary? Certainly he may. What are these old papers except the instruments as effectually used in closing the eyes of Dennison to the larceny of his money which the defendant was perpetrating under the deception practiced by their use, as a burglar uses his jimmie to break open a safe? The case of *Boyd* v. *U. S.,* 116 U. S. 616, is not in point. There, the unlawful seizure discussed is of private papers, such as books, correspondence, bills, invoices, and other papers relating to goods which it is claimed had been imported in violation of the revenue laws. Neither the papers in question nor the case was at all

similar to this one. The case of *Entick* v. *Carrington,* 19 Howell St. Trials, 1029, in which ·Lord Camden delivered the opinion which, Mr. Justice Bradley says, is considered one of the land marks of English liberty, a permanent monument to the British constitution and a monument of English freedom, was an action of trespass for entering the plaintiff's dwelling and breaking open his desks, boxes, etc., and searching and examining his papers. That was not a case in which instruments for the perpetration of crime were taken from the person of a man actually charged with the very crime in which the instruments were used.

What has been said on this subject disposes of the objection to the admission of the testimony of witnesses Bogess, Harrison, Fleming and Dennison concerning these old papers.

Instruction No. 2 given for the State is complained of. It was substantially that there might be larceny even though the possession of the property stolen was willingly relinquished by its owner and that if the jury believed from the evidence, beyond a reasonable doubt, that the defendant obtained the possession of Dennison's money by means of false representations with felonious intent at the time of stealing it, and, after obtaining its possession· he feloniously converted the same to his own use without the consent of Dennison, they should find the defendant guilty. This is a correct enunciation of the law, as has been shown, and the instruction was properly given. Instruction No. 2, asked for by the defendant was refused and it is claimed that the court erred therein. It was to the effect that, to constitute the crime of larceny, there must be a taking and a carrying away by a trespass of the personal property, etc., without any explanation of the meaning of the word "trespass" or what amounts to trespass in such case. From what has been said on this subject, it is manifest that the instruction would have been misleading. It was, therefore, properly refused. Instruction No. 5, asked for by the defendant, was also refused and the action of the court in reference to it is complained of. It was, in substance, that there could be no conviction for larceny upon evidence of obtaining money under false representations if the jury believe Dennison had willingly parted with his money. There was no evidence to warrant the instruction upon the law of obtaining money under false pretenses. There was nothing in the evidence from which it might be inferred

that Dennison had parted with anything more than the possession of his money, and that, as has been shown, he might do willingly, and yet the defendant could nevertheless be convicted of larceny.    The evidence only imported a common law larceny. The judgment is free from error and must be affirmed.

*Affirmed.*