STATE, RESPONDENT, *v.* FULLER, APPELLANT.

(No. 2,230.)

(Submitted February 28, 1906.   Decided March 19, 1906.)

*Criminal Law—Evidence—Constitutional Guaranties—Instructions—Harmless Error.*

Criminal Law—Murder—Cross-examination—Exclusion of Evidence—Harmless Error.

1.   While the interest and feeling exhibited by a witness are material elements to be weighed by the jury in determining his credibility, yet, where in a prosecution for murder, a witness for the state had testified on cross-examination that he had not told the county attorney that he wanted to testify but that he "just went up there and told him"—thus making his interest in the case apparent to the jury—the exclusion of a further question whether he had sent anyone else to tell the county attorney of his desire to testify, though technically erroneous as an undue restriction of the cross-examination, was without prejudice.

Same—Evidence—Refusal to Strike Out—Error Cured.

2.   Where the trial court, in a prosecution for murder, at first refused to strike out certain hearsay testimony, but subsequently ordered it stricken, and admonished the jury, both orally and in an instruction, not to consider it in making up their verdict, the prior erroneous ruling was fully cured and defendant cannot be heard to complain.

Same—Evidence—Waiver—Comparison of Shoes with Footprints—Admissibility—Constitutional Guaranties.

3.   Where, on a trial for murder, defendant consented to the taking of his shoes for the purpose of comparison with footprints, leading from the place of the homicide, he waived the right to object to the use of such evidence against him on the ground that the Constitution, Article III, section 18, forbids its use when it declares that no person shall be compelled to testify against himself in a criminal proceeding.

Same.

4.   *Obiter:* Evidence obtained by the taking of the shoes of defendant, charged with murder, against his consent, and comparing them with footprints leading from the place of the crime, is admissible, and its use does not deprive him of the constitutional guaranties prohibiting unreasonable searches and seizures (Const., Art. III, sec. 7), and declaring that no person shall be compelled to testify against himself in a criminal proceeding (sec. 18).

**Same—Trial—District Courts—Commenting on Evidence.**

5.  Where, in a prosecution for murder, the trial court casually remarked, when a transcript of the evidence taken at the coroner's inquest was offered in defendant's behalf for impeachment purposes, that it was admitted for "what it was worth," such remark was not prejudicial to the defendant as a comment upon the weight of the evidence so offered.

**Same—Instructions—Defining Malice.**

6.  A definition of "malice" in an instruction, not precisely conforming to Penal Code, section 7, but nevertheless sufficiently comprehensive to give the jury a definite idea of the meaning of the word, was not a cause for reversal, in the absence of a request for a more specific instruction.

**Same—Instructions—"Heat of Passion"—Harmless Error.**

7.  Alleged error in an instruction in defining the expression "heat of passion" was harmless, where the jury found defendant guilty of murder in the first degree, and where the evidence did not tend to show a case of manslaughter.

**Instructions—To be Taken Together.**

8.  In construing instructions to the jury the whole charge should be taken together.

**Criminal Law—Instructions—Credibility of Witnesses—Harmless Error.**

9.  An instruction, in a prosecution for murder, which informed the jury that if they found that any witness had willfully and deliberately testified falsely as to any material fact in the case, they were at liberty to disregard his entire testimony, while in a subsequent sentence in the same paragraph the law was stated correctly: that such testimony could only be ignored in case no other corroborative evidence entitled to credit had been produced—though conflicting and erroneous, was not cause for reversal where it was not apparent that the jury were misled and where the verdict of guilty was obviously correct.

**Same—Failure of Defendant to Testify—Instructions.**

10.  In a prosecution for murder, where the defendant had not been sworn as a witness, it was proper for the court, if it saw fit so to do, to instruct the jury that the defendant in a criminal proceeding cannot be compelled to be a witness against himself, and that if he does not testify this fact must not be used to his prejudice.

*Appeal from District Court, Silver Bow County; Michael Donlan, Judge.*

MILES FULLER was convicted of murder of the first degree. From the judgment and from an order denying him a new trial he appeals. Affirmed.

*Mr. John Lindsay, Mr. James M. Baldwin,* and *Mr. Edwin S. Booth,* for Appellant.

A seizure which would tend to the production of evidence against appellant is an unreasonable seizure within the meaning of the Constitution. (*Boyd* v. *United States,* 116 U. S. 616,

6 Sup. Ct. 524, 29 L. Ed. 746 et seq.; *Counselman* v. *Hitchcock,* 142 U. S. 547, 12 Sup. Ct. 195, 35 L. Ed. 1110 et seq.; *Brown* v. *Walker,* 161 U. S. 591, 16 Sup. Ct. 644, 40 L. Ed. 819 et seq.; *United States* v. *Wong Quong Wong,* 94 Fed. 832.) A confession wrung from the appellant by force or putting in fear would have been excluded. Is it not reasonable to say that by analogy testimony secured by the use of articles of personal property taken by force from the possession of appellant should likewise be excluded and that its admission was error? To hold otherwise would be to say that officers may deprive a person of his property without due process of law and may aggravate the offense by using the same in an endeavor to deprive him of his life or liberty. This cannot be. (*State* v. *Rambo,* 69 Kan. 777, 77 Pac. 563, 564.)

In commenting upon the evidence the court invaded the province of the jury. The jury are the judges of the facts and of the effect or value of the evidence. (Pen. Code, 2105, 2078; Code Civ. Proc., 3390, 3123; *Gallick* v. *Bordeaux,* 31 Mont. 328, 78 Pac. 583, 584; *Yoder* v. *Reynolds,* 28 Mont. 183, 196, 72 Pac. 417; *State* v. *Hurst,* 23 Mont. 484, 492, 59 Pac. 911.) And in commenting upon the weight of the testimony the court committed error. (*Yoder* v. *Reynolds,* 28 Mont. 183, 196, 72 Pac. 417.) Remarks made by the judge during the progress of the trial, if immaterial and improper, may, when properly excepted to and brought into the record, constitute prejudicial and available error. (*Kirk* v. *Territory,* 10 Okla. 46, 60 Pac. 797, 801 et seq.; *Wilson* v. *Territory,* 9 Okla. 331, 60 Pac. 112; *State* v. *Crotts,* 22 Wash. 245, 60 Pac. 403; *State* v. *Taylor,* 7 Idaho, 134, 61 Pac. 288; *State* v. *Lucas,* 24 Or. 168, 33 Pac. 538, 540; *Mathias* v. *State,* 45 Fla. 46, 34 South. 287; *State* v. *Allan,* 100 Iowa, 7, 69 N. W. 274, 275; *Bradshaw* v. *State,* 44 Tex. Cr. App. 222, 70 S. W. 215; *Wastl* v. *Montana Union Ry. Co.,* 17 Mont. 213, 217, 42 Pac. 772.)

The remark that the evidence was "Let in for what it was worth" has been held error, the reason being that the expression was liable to be taken by the jury as an intimation that in the opinion of the court the evidence was of little consequence.

(*Howland* v. *Oakland etc. Ry. Co.,* 115 Cal. 495, 47 Pac. 255, 257, 258.) And the error cannot be cured by instructions. (*State* v. *Taylor,* 7 Idaho, 134, 61 Pac. 289; *People* v. *Kindleberger,* 100 Cal. 367, 369, 34 Pac. 852.) The record in question was the official return of the coroner relating to the proceedings had and the testimony taken at the inquest held over the body of the decedent, and every presumption was in favor of its verity.

*Mr. Albert J. Galen,* Attorney General, and *Mr. W. H. Poorman,* Assistant Attorney General, for Respondent.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

On November 7, 1904, defendant was by information charged with the crime of murder, and thereafter, having been tried upon his plea of not guilty thereto, was convicted of murder of the first degree and sentenced to death. He has appealed from the judgment and from an order denying him a new trial.

The brief of counsel assigns many rulings and decisions of the court, which, it is alleged, prejudiced the defendant in his substantial rights. Of these only a few are sufficiently meritorious to require special notice. The following brief statement of the facts will be sufficient to make clear the contentions made: It appears that the homicide grew out of a grudge of long standing between the defendant and Henry Gallahan, the deceased. The defendant had repeatedly stated that he intended to kill Gallahan at the first opportunity. He made this statement to the deceased himself in the presence of one of the witnesses, a few days prior to the killing. Both men occupied cabins a short distance west of the city of Butte. About 6 o'clock on the evening of October 24, 1904, two of the witnesses going east into the city, along one of its principal streets near its western outskirts, met the deceased going west, near where he was killed. One of these, two or three minutes after passing the deceased, saw the defendant standing be-

hind the corner of a school building "peeking" in the direction the deceased was going. A short time later the two, the defendant and the deceased, were observed further west standing a few yards apart on the hillside. No one was near enough to them to hear what, if anything, was said by either of them. The defendant first fired at the deceased. They then exchanged shots rapidly, both using revolvers, until the deceased fell mortally wounded by a shot in the head. The defendant then started west, but stopped, returned to where the deceased was lying, slashed his throat twice with a knife or other sharp instrument, severing the jugular vein, and then fled, escaping in the dusk of the evening. Those who witnessed the shooting were from two hundred and fifty to six hundred feet away; two of them, Semmons and Almquist, pursued the defendant for some distance. Though there was not sufficient light to enable him to distinguish the features of a man clearly, Almquist recognized him. Later on the same evening he was arrested. On the following day the undersheriff took the shoes worn by the defendant at the time of the arrest and compared them with footprints found leading from the place of the shooting to within a short distance of defendant's cabin. The impression made by the shoes corresponded exactly with these footprints. The evidence is that the undersheriff told the jailer to get defendant's shoes and that he went and took them off defendant in the corridor of the jail where he then was.

Gladstone Bray had witnessed the affray, but, though his name had been given to the coroner, he had not been called to testify at the inquest, nor had the county attorney been informed of the fact that he was an eyewitness until, on the evening before the trial began, he gave the information himself. When the trial opened, this fact having been made to appear, his name was by permission of the court indorsed upon the information. He was thereupon called and sworn as a witness. In one place in his testimony he positively identified the defendant as the man who was seen running from the scene of the shooting. On cross-examination, being questioned how he came to be called as a witness, he stated: "I did not

go to the county attorney and tell him I wanted to testify in the case. I just went up there and told him." He was then asked: "Did you send anyone else to him to tell him that you wanted to testify?" The county attorney having interposed a general objection, the witness was not permitted to answer. This ruling is assigned as error, because, it is said, the answer would "perhaps" have shown the interest of the witness in the outcome of the case, and hence should have gone to the jury as reflecting upon his credibility.

The interest and feeling of a witness are always material elements to be weighed and considered by the jury in determining the credibility of his story. It does not appear, however, from any offer made by counsel what the answer of the witness would have been, nor that they expected to contradict him if his answer had been in the negative. The witness had already stated that he had volunteered his evidence, thus evincing a willingness to see the defendant convicted; and if it be conceded that the ruling of the court was technically wrong as an undue restriction of the cross-examination, as we think it was, yet an affirmative answer would not have added further evidence of his interest. Evidently, since counsel did not prosecute the inquiry further or make an offer to prove, they were satisfied that they had obtained from the witness all the evidence they could showing interest. We think the ruling, though technically erroneous, was without prejudice.

The same witness in another place of his cross-examination testified: "Q. You don't know who fired them [the shots] of your own knowledge? A. I knew it was Fuller and Gallahan. Q. How do you know? A. Because I heard the people talking about it." Contention is made that this portion of his evidence is hearsay, and that the court erred in refusing to strike it out. The court did at first refuse to strike it out, but a few moments later, upon attention being called to it by counsel, the whole of it was stricken out and the jury admonished not to consider it. Further, the court submitted an instruction calling the attention of the jury specifically to the

fact that certain testimony had been stricken out and that they must bear this constantly in mind during their deliberations, and not make use of it in making up their verdict. The prior erroneous ruling was thus fully corrected and the contention of counsel is not sustained by the record.

The testimony of the undersheriff, touching his comparison of defendant's shoes with the footprints leading from the place of the shooting, together with the shoes, was admitted, over objection by counsel that the use of this character of evidence was a direct violation of the constitutional prohibition that "no person shall be compelled to testify against himself in a criminal proceeding" (Constitution, Montana, Article III, section 18), and also of the guaranty that "the people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures" (Constitution, Montana, Article III, section 7). Counsel also rely upon Articles V and IV of the amendments to the Constitution of the United States, which, respectively, embody substantially the same provisions.

We do not think the evidence shows that what was done by the undersheriff was without the defendant's consent. From this point of view the defendant may not complain; for the privilege guaranteed by the first provision of the Constitution cited may be waived by consent, either expressly or by implication. Otherwise a defendant who has offered himself as a witness in his own behalf would not be subject to cross-examination bringing out criminatory facts, should he conclude not to submit to it. The rule is, as pointed out by Mr. Wigmore in his work on Evidence (Vol. 3, sec. 2276), that when the defendant offers himself as a witness in his own behalf, he waives his privilege as to all matters pertinent to the issues involved. So, if the defendant consented to the use of his shoes, voluntarily surrendering them to the officer for the purpose for which they were used, he cannot now complain that the evidence so discovered was used against him. And these remarks apply as well to the guaranty of security in the other provision; for, if the shoes were taken by the defendant's consent,

he cannot be heard to complain that the officer was guilty of an unlawful seizure.

But, accepting the theory of the defendant that the evidence does establish a taking without his consent, we still think the evidence in question was properly admitted. The prohibition first invoked is nothing more than a statement of the common-law rule of evidence, and guarantees no greater privilege than that all persons, whether parties or extraneous witnesses, shall be free from compulsion by legal process to give self-incriminating testimony. After tracing the history of the rule, Mr. Wigmore states its object thus: "Looking back at the history of the privilege and the spirit of the struggle by which its establishment came about, the object of the protection seems plain. It is the employment of legal process to extract from the person's own lips an admission of his guilt, which will thus take the place of other evidence. Such was the process of the ecclesiastical court, as opposed th̄ _____ ̄wn centuries—the inquisitorial method of putting the accused upon his oath, in order to supply the lack of the required two witnesses. Such was the complaint of Lilburn and his fellow-objectors, that he ought to be convicted by other evidence, and not by his own forced confession upon oath. Such too, is the inference from the policy of the privilege as a defensible institution; that is to say, it exists mainly in order to stimulate the prosecution to a full and fair search for evidence procurable by their own exertions, and to deter them from a lazy and pernicious reliance upon the accused's confessions. Such, finally, is the practical requirement that follows from the necessity of recognizing other unquestioned methods of procuring evidence, for, if the privilege extended beyond these limits, and protected an accused otherwise than in his strictly testimonial status; if, in other words, it created inviolability not only for his physical control of his own vocal utterances, but also for his physical control in whatever form exercised, then it would be possible for a guilty person to shut himself up in his house, with all the tools and indicia of his crime, and defy the authority of the law to employ in evidence anything that might be obtained

by forcibly overthrowing his possession and compelling the surrender of the evidential articles—a clear *reductio ad absurdum.* In other words, it is not merely compulsion that is the kernel of the privilege, in history and in the constitutional definitions, but *testimonial compulsion.* The one idea is as essential as the other. The general principle, therefore, in regard to the form of the protected disclosure, may be said to be this: The privilege protects a person from any disclosure sought by legal process against him as a witness.'' (Section 2263, p. 3123.)

As further pointed out by this author, the privilege also extends to the production by a person of documents or chattels in response to a subpoena, or to a motion to order production, or to other forms of process treating him as a witness, because at any time he might be liable to be called upon to establish the identity, authenticity, or origin of the article produced. And this view is sustained generally by the courts. In New York it is held that it is no invasion of this privilege to compel the defendant to stand up in the presence of the jury so that he may be identified by a witness. ''The main purpose of the provision [of the Constitution] was to prohibit the compulsory oral examination of prisoners before trial, or upon trial, for the purpose of extorting unwilling confessions or declarations implicating them in crime. It could reach further only in exceptional and peculiar cases coming within the spirit and purpose of the inhibition. A murderer may be forcibly taken before his dying victim for identification, and the dying declarations of his victim may then be proved upon his trial for his identification. A thief may be forcibly examined and the stolen property may be taken from his person and brought into court for his condemnation. A prisoner's person may be examined for marks and bruises, and then they may be proved upon his trial to establish his guilt; and it would be stretching the constitutional inhibition too far to make it cover such cases and cases like this, and the inhibition thus applied would greatly embarrass the administration of justice.'' (*People* v.

*Gardner,* 144 N. Y. 119, 43 Am. St. Rep. 741, 38 N. E. 1003, 28 L. R. A. 699.)

In Tennessee and Texas it is held in cases of larceny that, though a confession has been extorted from the defendant by fear of punishment or the hope of immunity and is therefore inadmissible, yet, if by means of information thus gained by the officers the stolen property is found, this fact is admissible, together with the further fact that the defendant informed them of its placè of concealment; the knowledge thus evinced by him putting it upon him to give such explanation as he may exculpating himself. (*White* v. *State,* 3 Heisk. (Tenn.) 338; *Selvidge* v. *State,* 30 Tex. 60.) This is the rule in New York also. (*Duffy* v. *People,* 26 N. Y. 588.)

In *State* v. *Graham,* 74 N. C. 646, 21 Am. Rep. 493, the defendant was charged with larceny. Footprints were discovered at the scene of the crime and leading to and from it to a fence in the direction of defendant's house. The officer who made the arrest compelled the prisoner to put his foot in the tracks, thus demonstrating an exact correspondence. This was proved upon the trial, over defendant's objection. On review the court held the evidence admissible on the theory that, though the act of the officer was an invasion of defendant's rights, yet it did not affect the resemblance, the only fact which had weight as evidence.

Applying the 'same rule, the supreme court of Alabama, on a trial for arson, held that it was competent for the state to show that shoes taken from defendant's house and belonging to him were compared with tracks found near the scene of the crime, and were the same in length and breadth. (*Morris* v. *State,* 124 Ala. 44, 27 South. 336.)

The case of *Myers* v. *State,* 97 Ga. 76, 25 S. E. 252, is directly in point. There, as here, the officer in charge of the prison ordered the prisoner's shoes to be taken from him for the purpose of comparing them with tracks found near the place, where the body of the murdered man was discovered. The trial court excluded the evidence of the officer as to the result of the comparison, but failed to admonish the jury not to con-

sider it. On review it was held that the omission to admonish was not prejudicial, because the evidence was competent and should have been admitted, and the court remarked that "it was the duty of the officer to have taken from the possession of the defendant any article which he might have had that would throw any light upon the circumstances of his guilt or innocence, and preserve it for use at the trial." Similar instances of the application of the rule may be multiplied almost indefinitely. (*People* v. *McCurdy,* 68 Cal. 576, 10 Pac. 207; *England* v. *State,* 89 Ala. 76, 8 South. 146; *People* v. *Rowell,* 133 Cal. 39, 65 Pac. 127; *State* v. *Morris,* 84 N. C. 756; *People* v. *Keep,* 123 Mich. 231, 81 N. W. 1097; *Commonwealth* v. *Pope,* 103 Mass. 440; *Squires* v. *State,* 39 Tex. Cr. Rep. 96, 73 Am. St. Rep. 904, 45 S. W. 147.)

The cases of *Counselman* v. *Hitchcock,* 142 U. S. 547, 12 Sup. Ct. 195, 35 L. Ed. 1110, and *Brown* v. *Walker,* 161 U. S. 591, 16 Sup. Ct. 644, 40 L. Ed. 819, cited by counsel, are not opposed to the rule laid down by Mr. Wigmore and in the cases cited. Indeed, they are both cases in which criminatory evidence was sought to be extorted by compulsory process, in direct violation of the privilege.

There can be no controversy as to the general rule that footprints or other marks or tokens found upon or near the place of the crime may be admitted to connect the accused with it and identify him as the guilty person, if the evidence tends to show that he left such evidences behind him. (*People* v. *Mead,* 50 Mich. 228, 15 N. W. 95; *Harris* v. *State,* 84 Ga. 269, 10 S. E. 742; *Gray* v. *State,* 42 Fla. 174, 28 South. 53; *State* v. *Reed,* 89 Mo. 168, 1 S. W. 225; Underhill on Criminal Evidence, sec. 313; 1 Wigmore on Evidence, sec. 413.) Nor do we understand that it is in this case drawn in question by the defendant.

The guaranty of the state and federal Constitutions against unreasonable searches and seizures does not, as we understand it, establish a rule of evidence, but insures inviolability of the homes, persons, and effects of the citizens from unreasonable searches and seizures, or, in other words, searches and

seizures not authorized by law. Its purpose was and is to declare unlawful and prohibit the use of general warrants to search the homes of citizens and seize their books and papers and other effects, to be used against them as evidence in pending controversies. It grew out of the bitter contest between Wilkes and the English government in 1762 (*Wilkes' Case,* 19 How. St. Tr. 982), and was finally established as a part of the English Constitution by Lord Camden's decision in *Entick* v. *Carrington,* in 1765 (19 How. St. Tr. 1029). Both of these cases were actions for trespass against officers of the crown who had made or authorized indiscriminate searches and seizures of the plaintiffs' papers and other effects under general warrants. In neither of them, however, was the competency of the evidence thus found brought in question.

The provision in the state and federal Constitutions is therefore a limitation upon the powers of the respective governments declaring all searches and seizures unlawful and forbidding the legislature and the Congress to authorize them, when they do not fall within the limitation; and the redress for the wrong therein denounced is an appropriate action directly against those who have been guilty of trespass. Except where there is a violation of the rule prohibiting the enforced production of self-criminating testimony heretofore considered, the competency of the particular evidence is not affected by the means by which it has been obtained, and this rule has generally been recognized by the courts in the United States.

In *State* v. *Flynn,* 36 N. H. 64, the court said: "It seems to us an unfounded idea that the discoveries made by the officers and their assistants, in the execution of process, whether legal or illegal, or where they intrude upon a man's privacy without any legal warrant, are in the nature of admissions made under duress, or that it is evidence furnished by the party himself upon compulsion. The information thus acquired is not the admission of the party, nor evidence given by him, in any sense. The party has in his power certain mute witnesses, as they may be called, which he endeavors to keep out of sight, so that they may not disclose the facts which he is desirous

to conceal. By force or fraud access is gained to them, and they are examined, to see what evidence they bear. That evidence is theirs, not their owner's. If a party should have the power to keep out of sight, or out of reach, persons who can give evidence of facts he desires to suppress, and he attempts to do that, but is defeated by force or cunning, the testimony given by such witnesses is not his testimony, nor evidence which he has been compelled to furnish against himself. It is their own. It does not seem to us possible to establish a sound distinction between that case and the case of the counterfeit bills, the forger's implements, the false keys, or the like which have been obtained by similar means. The evidence is in no sense his.'' The defendant had been indicted for keeping for sale a quantity of intoxicating liquor, in violation of the statute. An officer had searched his premises under a warrant issued by the police magistrate of Manchester. On the trial, testimony as to what the officer thus ascertained was admitted, over objection. On review, the appellate court stated its views as quoted above.

In *Gindrat et al.* v. *People,* 138 Ill. 103, 27 N. E. 1085, plaintiffs in error were upon trial for larceny of a diamond ring. Objection was interposed to the testimony of one De Sell, who, the evening after the robbery and acting as a detective, but without a warrant or authority from anyone, went to the rooms occupied by the defendants and there discovered certain criminatory facts and seized certain articles of jewelry, which were admitted in evidence. The objection was that the evidence was incompetent for that the means by which it was obtained was violative of section 6 of the Constitution of Illinois, the same in substance as the provision of our own and the federal Constitution cited. After discussing the purpose and meaning of the provision the court said: "Courts, in the administration of the criminal law, are not accustomed to be oversensitive in regard to the sources from which evidence comes, and will avail themselves of all evidence that is competent and pertinent and not subversive of some constitutional or legal right.'' The court quotes with approval from 1 Greenleaf on Evidence, as follows: "Though papers and other subjects of

evidence may have been illegally taken from the possession of the party against whom they are offered, or otherwise unlawfully obtained, this is no valid objection to their admissibility, if they are pertinent to the issue. The court will not take notice how they were obtained, whether lawfully or unlawfully, nor will it form an issue to determine that question.''

The case of *State* v. *Edwards,* 51 W. Va. 220, 41 S. E. 429, was similar. The defendant was charged with grand larceny, by depriving the prosecutor of his money by means of a trick by substituting therefor worthless state bank bills. Upon his arrest he was searched and other bank bills of the same character were found upon his person. On the trial these were admitted in evidence in connection with the testimony of the officer making the arrest, over the objection of counsel that they were incompetent because possession of them had been gained by an invasion of the personal rights of the defendant and an illegal seizure. The court, in reply to this objection, said: ''One complete answer to this is that if it was an illegal seizure, that is no objection to the use of the papers as evidence, they being proper evidence in the case in other respects; for the court can take no notice how they were obtained, whether lawfully or unlawfully; nor would it form a collateral issue to determine that question [citing authorities]. But the seizure was not illegal, for the reason that these papers were instruments or tokens used by the defendant in the perpetration of the crime with which he is charged and with which he stood charged at the time they were taken from his person. There is such a thing as unreasonable search, which the law will not permit, but where a person stands charged with crime, and an instrument or device is found upon his person or in his possession which was a part of the means by which he accomplished the crime, those instruments, devices, or tokens are legitimate evidence for the state and may be taken from him and used for that purpose.'' We can see no valid distinction between these cases and the one at bar. The following cases are also in point: *People* v. *Adams,* 176 N. Y. 351, 98 Am. St. Rep. 675, 68 N. E. 636, 63 L. R. A. 406; *Commonwealth* v. *Tib-*

*betts,* 157 Mass. 519, 32 N. E. 910; *State* v. *Mallett,* 125 N. C. 718, 34 S. E. 651; *Russell* v. *State,* 66 Neb. 497, 92 N. W. 751. (See, also, 3 Wigmore on Evidence, sec. 2264.)

Counsel for defendant cite *Boyd* v. *United States,* 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746, as conclusive of their contention. But we do not think it has any application. In that case the question before the court was the constitutionality of a statute which authorized a federal court in revenue cases on motion of the government to require the claimant to produce in court his books, invoices, or papers to be used as evidence against himself in order to declare a forfeiture. The legislation was declared repugnant to Amendments IV and V of the Constitution of the United States. In so far as the order required the production of self-criminatory matter, it was within the prohibition of the fifth amendment; but, as we have seen, its evidentiary value could not be affected by the fact that it was obtained by a trespass upon the rights guaranteed by the fourth amendment, notwithstanding the *dictum* in the majority opinion of the court to the contrary.

It is said that the court committed error in commenting upon the weight of the evidence in the presence of the jury during the progress of the trial. This contention is based upon a statement by the judge during the trial, with reference to a transcript of the evidence taken at the coroner's inquest which had been admitted in favor of the defendant for impeachment purposes, to the effect that the evidence had been admitted for "what it was worth." The judge should, during the course of the trial, refrain from remarks that are calculated in any way to influence the minds of the jury. This includes remarks to counsel touching the management of the case and reflecting upon their conduct, as well as those touching the character of the witnesses and the value of their testimony; and, if the remarks so made are material and improper, they may be prejudicial. Accordingly, if properly excepted to and brought into the record, they may work a reversal of the case on that ground. (Elliott on Appellate Procedure, sec. 671.) Jurors have great confidence in and respect for the presiding judge, and are vigi-

lant in their attention to whatever is said by him. He cannot be too careful in guarding his conduct in this regard. (*Cronkhite* v. *Dickerson,* 51 Mich. 177, 16 N. W. 371.) This is the common observation of all who have frequented the courts or have taken part in their proceedings. But, while this is true, it is not every remark so made that may be alleged as ground of error. The court is frequently called upon to rule on questions presented during the progress of the trial. In overruling objections to evidence, even if it is done in the briefest way, the decision necessarily is that such evidence is competent and has some weight; and if, in making the ruling, the remark is incidentally made that the evidence is admitted for what it is worth, this is no more than what is always impliedly said with reference to all the evidence in the case; for it is all admitted for what it is worth, and this, it would seem, is what each juror is presumed to understand. The same may be said of other rulings. We cannot think that the casual remark of the judge here made the subject of animadversion could have been understood as an expression of opinion as to the weight of the evidence, or that it prejudiced the defendant in any degree whatever.

Paragraph 13 of the charge deals with the subject of malice as a constituent element of the crime of murder. Complaint is made that it is erroneous. While it does not define the term "malice" in the exact words of the Penal Code (section 7), it is sufficiently comprehensive to give the jury a definite idea of its meaning, especially so in the absence of a request for a more specific instruction.

We do not think the defendant has any ground to complain of the court's definition of the expression "heat of passion." The jury found him guilty of murder of the first degree. Whether, therefore, the definition be correct or not, the jury could not have been misled by it. The finding that the killing was prompted by deliberately premeditated malice aforethought excluded the idea of heat of passion as an element requiring consideration (*State* v. *Sloan,* 22 Mont. 293, 56 Pac. 364), thus evincing the fact that the jury properly did not consider this

instruction at all. Besides, the facts proven at the trial did not tend to show a case of manslaughter. The defendant has no reason to complain of a charge which authorized the jury to find him guilty of manslaughter, when the evidence tended to show a case of murder.

It is also said that the instruction assumes the fact that the defendant did the killing. This contention is not maintainable. The instruction, standing alone, is free from fault in this regard; but it is especially so when it is taken together with the rest of the charge. (*State* v. *Rolla,* 21 Mont. 587, 55 Pac. 523; *Territory* v. *Hart,* 7 Mont. 502, 17 Pac. 718.)

Paragraph 20 of the charge, after quoting section 3123 of the Code of Civil Procedure, as to the credibility of witnesses and the method by which they may be impeached, proceeds: "If you find that any witness has testified willfully and deliberately false as to any material fact in this case, you are at liberty to disregard his entire testimony. And in this case, if the jury believe from the evidence that any witness has sworn willfully false to any fact material to the issue, they are at liberty to disregard the entire testimony of such witness, in so far as the same has not been corroborated by other credible evidence." The first sentence of the language quoted, standing alone, is erroneous, under the ruling laid down in *State* v. *De Wolfe,* 29 Mont. 415, 101 Am. St. Rep. 579, 74 Pac. 1084, and in *Cameron* v. *Wentworth,* 23 Mont. 70, 57 Pac. 648. As is said in the latter case, the power of the jury should be confined to the formulation of a judgment upon the evidence within the exercise of legal discretion, and in subordination to the rules of evidence. So, while they may disregard the testimony of a witness who has been guilty of deliberate perjury in a material matter, they may do so only in subordination to the limitation that there is no other corroborative evidence in the case entitled to credit. If there is such evidence, they may not disregard the entire story of the witness, but only the false statement. The language quoted, taken together, seems to have been an attempt on the part of the court to state, first, an abstract proposition of law, followed by a concrete application of it to the facts of the case.

But be this as it may, the verdict of the jury was obviously correct. The defendant introduced practically no testimony at all of a substantive character to establish a defense, such as alibi or self-defense, or to contradict the statements of the state's witnesses. His evidence was confined to an impeachment of the evidence introduced by the state. Under the circumstances, we think the jury were not misled by the erroneous statement in the first part of the paragraph quoted.

It is a familiar principle that an instruction, even if it be erroneous, will not be sufficient to set aside a verdict, if it is apparent that the jury were not misled thereby. As stated by Mr. Thompson: "Thus it is said that instructions faulty or technically erroneous will not work a reversal of the judgment if the jury were not misled, or if, as a whole, the case was fairly presented to them, and especially if their verdict is obviously correct." (Thompson on Trials, sec. 2431.) Under the circumstances of this case, though the instruction is technically erroneous, it is not apparent that the jury could have been misled by it, though the general rule is, as has always been recognized by this court, that contradictory instructions are sufficient to reverse the judgment. (*State* v. *Sloan,* 22 Mont. 293. 56 Pac. 364; *State* v. *Keerl,* 29 Mont. 508, 101 Am. St. Rep. 579, 75 Pac. 362.)

In instruction No. 24 the court charged the jury as follows: "The court instructs the jury that a defendant in a criminal action or proceeding cannot be compelled to be a witness against himself, and if the defendant does not claim the right to be sworn and does not testify, this fact must not be used to his prejudice." Criticism is made of this part of the charge for that it comments upon and calls the attention of the jury to the fact that the appellant did not testify, and also informed the jury that the appellant might have testified had he so desired, but that the state could not compel him to do so. The defendant was not sworn as a witness. This fact was apparent to the jury. The court was perhaps not bound to instruct the jury with reference to this fact. It was entirely proper, however, if the court chose to do so, to inform the jury, as it did, that the fact

that the defendant failed to testify could not be used to his prejudice. In any event, the instruction was favorable to the defendant, and for that reason he has no right to complain of it.

With reference to the instructions requested and refused, it is sufficient to say that they are all fairly covered by the instructions submitted, which are full, fair, and, generally speaking, applicable to the facts proven. We find no error which we think was prejudicial to the defendant.

The judgment and order are affirmed.

*Affirmed.*

MR. JUSTICE HOLLOWAY concurs.

MR. JUSTICE MILBURN : I concur in the conclusion and in all of the opinion, except that portion in regard to the shoes of the defendant. What is said in the opinion in that regard is ably stated, comprehensive and, I think, correct in a proper case; but I consider it all unnecessary in the case before us, for the reason that it does not appear whether the shoes were taken from the defendant by his consent or not. As said in the statement of facts in the opinion : "The evidence is that the undersheriff told the jailer to get defendant's shoes, and that he went and took them off defendant in the corridor of the jail where he then was." If the prisoner gave them up willingly—and there is nothing in the evidence to show that he did not, and there is nothing in the record that implies that he did not—then the argument in the opinion in regard to the shoes is entirely unnecessary. It is sufficient, in my opinion, to say that the point raised by counsel for the defendant in respect of the shoes does not appear to be well taken, for the reason that there is not any evidence in the case supporting his contention or tending to support it.